IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAMELA ROSKOWSKI,

|                | Plaintiff,          | Civil No. 03-474-AS |
|----------------|---------------------|---------------------|
|       v.       |                     | FINDINGS AND RECOMMENDATION |

CORVALLIS POLICE OFFICERS'
ASSOCIATION, an Oregon non-profit
corporation, and THE INTERNATIONAL
BROTHERHOOD OF TEAMSTERS,
LOCAL 223, a labor organization,

                              Defendants.
_____

ASHMANSKAS, Magistrate Judge:

Defendants in this matter, the Corvallis Police Officers' Association, an Oregon nonprofit

corporation (the "Association"), and the International Brotherhood of Teamsters, Local 223, a labor

organization (the "Local")(collectively "Defendants") move for summary judgment on all claims

asserted against them by plaintiff Pamela Roskowski ("Plaintiff"). For the reasons set forth below,

the court recommends granting Defendants' motion for summary judgment.

/ / / / /

<u>Background</u>

Plaintiff was hired as the chief of police for the city of Corvallis in 1990. She served in this capacity until December 31, 2002. The conduct of the Association in Plaintiff's last year as Corvallis police chief is at the center of this dispute. Specifically, Plaintiff complains that Defendants engaged in a campaign to discredit her and for her to resign from her position as Corvallis police chief. Plaintiff alleges that Defendants published numerous false and defamatory statements in various press releases issued by the Association and on a website created by the Association. The Defendants' alleged smear campaign and the contents of the press releases are summarized below.

It appears that Defendants' patience ran out when Plaintiff responded favorably to a citizen complaint filed against two or three police officers by a friend of Plaintiff. Specifically, in October 2001, a Corvallis police officer made a traffic stop of a car that was exceeding the speed limit. After questioning the driver and the two passengers in the car, the officer arrested the driver for driving under the influence of intoxicants and issued minor in possession citations to the two passengers. The officer also ordered the car towed based on the driver's inability to provide proof of insurance despite the fact that the owner of the car represented to the officer that he had insurance and wanted to pick the car up.

The owner of the car, who was an acquaintance of Plaintiff, filed a complaint against the officer asserting that the officer wrongfully towed his car. Plaintiff, as chief of police, reviewed all complaints. In this instance, Plaintiff ordered the owner be reimbursed for the costs of towing the vehicle. Additionally, Plaintiff ordered the withdrawal of the two minor in possession citations issued to passengers in the vehicle, one of whom was the car owner's son. In December 2001, the

Benton County District Attorney wrote a letter to the Criminal Justice Division of the Oregon Department of Justice (the "Justice Department") to conduct an investigation into Plaintiff's actions with regard this incident. The District Attorney was concerned that Plaintiff had engaged in official misconduct and showed favoritism toward the parties involved in the Incident.

On April 17, 2002, the Association convened a meeting to discuss Plaintiff and hold a "no confidence" vote. Ninety-four percent of the officers present at the meeting voted "no confidence" in Plaintiff as police chief. The majority felt that she was unable to effectively lead or manage the Corvallis police department. Sargent Dennis Carson, then president of the Association and a Corvallis police officer for 18 years, informed Clayton Banry, secretary and treasurer of the Local, of the Association's vote of "no confidence."

On April 18, 2002, the Association's board of directors, composed of Carson, Mike Mann, Mike Wells, Jeff Vanarsdall, Greg Kantola and Jim Crain, prepared a press release to advise the public of the Association's "no confidence" vote and to publicly demand Plaintiff's immediate resignation. The release expressed the Association's dissatisfaction with Plaintiff's management style explaining that:

> Chief Roskowski clearly lacks qualities which are essential to the position of Police Chief. She is not an effective leader who recognizes that morale is vital and she has continuously demonstrated fiscal mismanagement, inept leadership, and a lack of concern for true public safety.

The primary content of the press release was generalized characterizations and opinions regarding Plaintiff's leadership but it also contained references to specific examples of mismanagement, which included: 1) the spending of large amounts of money to consultants that Plaintiff would ignore if she disagreed with their advice; 2) the purchase of a half-million dollar records management system against the advice of the committee formed to select the system, the failure of the system and

Plaintiff's inability to admit that the system did not work; 3) an increase in employee stress-related illness, sick time, turn over and litigation as a result of unwarranted discipline; 4) inadequate street patrol staffing (only four officers for a city of over 50,000, plus the student population at a major university; and 5) a change in department policy prohibiting the towing of vehicles when a driver has a suspended license, is uninsured or is driving while intoxicated.

A second press release from the Association followed immediately explaining in more detail the scenario surrounding the change in department policy regarding the impounding of vehicles. The Association referenced the numerous other issues raised in the initial press release but declined to go into more detail or give more examples until Plaintiff had "the opportunity to do the right thing and resign her position in order to save both herself and the citizens of Corvallis further public embarrassment."

On April 23, 2002, the Association expressed its regret that Plaintiff had not resigned and advised the public that the Association had requested an Executive Session meeting with the mayor and city councilors to discuss Plaintiff's performance as police chief. The Association indicated that it had attempted to share its concerns on numerous occasions with both Plaintiff and Jon Nelson, Corvallis's city manager, but had been unsuccessful.

The Association's next press release was dated May 9, 2002, and expressed frustration that four meetings with the city manager had not resulted in any progress (the May 9th Press Release"). Additionally, the Association set forth one example of Plaintiff's conduct that resulted in the "no confidence" vote. Specifically, a Corvallis police officer responded to a burglary in process call with his overhead lights and sirens on and was hit by a car in an intersection. Plaintiff disciplined the officer after he was found to be at fault for: 1) responding to the call without knowing that a

crime occurred; and 2) responding to a call for conduct that occurred outside the city limits. The Association expressed concerned that Plaintiff subsequently told the driver of the vehicle that collided with the officer that the city was not at fault.

The Association noted the inconsistency of disciplining an officer for responding to a call outside the city limits when Plaintiff did not object to a Corvallis police detective responding to a burglary call at her own house, which was outside the city limits and the detective's jurisdiction. The Association also complained about a new policy instituted by Plaintiff that prohibited officers from using emergency lights and sirens while responding to many emergency calls. The Association stated that this new policy put officers and the public in danger of increased collisions and prevented officers from responding to emergency calls in a timely manner.

A letter from John Steeves, a 911 dispatcher and spokesperson for the nonprobationary employees of the Corvallis Police Department, was quoted in a press release issued by the Association on May 13, 2002. A substantial majority of the nonprobationary and nonmanagement police department employees joined in the Association's "no confidence" vote. Steeves was sympathetic to the city manager's difficult task, but supported the Association's call for Plaintiff's resignation and a new leader who practices the values of integrity, honesty and fairness.

The next press release, dated May 20, 2002, set forth a number of public statements made by Plaintiff or her agents and then contradicted these statements with other statements made by Plaintiff or other evidence offered by the Association. These statements covered the areas of underage drinking, the dismissal of minor in possession citations, the reason for the "no confidence" vote, the Association's failure to follow established grievance procedures and the change in the tow policy.

The Association responded to a packet of information prepared by Plaintiff and distributed to the members of the city council and the community policing forum ( the "Packet") in a press release dated June 27, 2002. The Association stated that the "information was obviously written by Pam Roskowki's staff" and that "[m]uch of the information is inaccurate, incomplete and misleading." The Packet, in effect, summarized the affairs of the Corvallis police department during the tenure of Plaintiff and supported the summarization with charts and other information to support the summaries. The Association challenged a number of the conclusions stated in the Packet providing additional information and claiming that Plaintiff put a "spin" on the facts and was "misleading the public through deceptive presentation of the statistics." For example, the Association pointed out that Plaintiff had failed to include her own traffic accidents in the list of traffic accidents involving city vehicles. Also, the Association noted that, while the budget allowed for 52 police officers, Plaintiff had chosen to leave 6 of the positions unfilled. Of the 46 officers on the force, seven were recruits who had yet to reach permanent career status. Finally, the Association questioned Plaintiff's use of taxpayer dollars to prepare this defense to the complaints made against her and argued that this was another reason Plaintiff should be removed as the chief of police.

The Justice Department's investigation of Plaintiff culminated on July 30, 2002, with a report issued by Ron N. Nelson, criminal investigator, and Steven M. Briggs, assistant attorney general. The Justice Department's report noted the absence of written restrictions on Plaintiff's authority and stated that:

> Given the broad latitude the Corvallis Chief of Police has in running her department and in creating Corvallis P.D. policy, and given the paucity of restriction on her authority, we cannot say that her decision to reimburse the vehicle tow and to recall the MIP citations were an "unauthorized exercise of her official duties" * * * .

The Justice Department also considered whether Plaintiff had a duty, either defined by law or

inherent in her office, to refrain from engaging in actual bias or favoritisim towards individual

citizens. Assuming the existence of such a duty, the Justice Department concluded that there was

insufficient evidence to support charges against Plaintiff.

> Although Chief Roskowski devoted a surprising amount of attention to this relatively minor matter, and this could be construed as evidence of favoritism, it is also true that a Chief of Police in a city the size of Corvallis has the authority to place as great an emphasis on resolving citizen complaints as she chooses.

The Justice Department expressed concern about the inconsistencies in the stories told by Plaintiff

and two of her police officers about the decision to recall the citations but came just short of

accusing Plaintiff of falsifying her story.

> More troubling is the difference in recollections between Chief Roskowski, Captain Boldizsar and Lt. Mollahan concerning the citations. Her two subordinates recall the Chief making the decision to recall the citations, while the Chief states that Lt. Mollahan made the decision. Obviously, a person conscious of improper conduct may try to engage in revisionism.

> The Association issued another press release to respond to the Justice Department's report.[1]

The Association summarized the report as showing that:

> Roskowski made several extremely poor decision in her handling of this incident.

> Roskowski's statements to the Department of Justice Investigator in regards to who directed the citations dismissed is diametrically opposed to the statements of Captian Boldizsar and Lieutenant Mollahan.

> This is typical of Pam Roskowski to point the finger at others for her own shortcomings. It is clear to those of us who know her that she lied to the investigator. Lying is unacceptable to the CPOA and violates the police officer code of ethics.

> In addition to the many press releases generated by the Association, the Association

---

[1]The press release has a July 1, 2002, date, which is obviously in error. The date must be either July 31, 2002, or August 1, 2002.

sponsored a website and allowed, if not encouraged, the public to post messages about Plaintiff. The website was advertised in the local newspaper and was intended to be used as a public forum for discussion about Plaintiff and her service as chief of police  The Association posted most, if not all, of its own press releases on the website.

The Association provided two or three of its press releases to the Local and asked that they be faxed to a list of recipients.  The Association made this request because they did not have the capability to fax the press releases.

Eventually, the City of Corvallis entered into an agreement with the Association in the hope of ending the Association's campaign against Plaintiff.  The Agreement provided that the Association would work with the city and agree not to interfere with Plaintiff's employment search and the city manager would arrange for Plaintiff to step down and appoint an acting-in-capacity police chief effective January 2003.  The Association was instructed to forward all inquiries from Plaintiff's prospective employers to the city manager.

Plaintiff retired as Corvallis police chief in early 2003 and accepted a job as chief of police and director of public safety for the University of California in San Francisco.  Plaintiff began her new job in February 2003.

<u>Legal Standard</u>

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).  "[T]he requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anthes v. Transworld Systems, Inc.</u>, 765 F. Supp. 162, 165 (Del. 1991) (citing <u>Anderson v. Liberty Lobby,</u>

Inc., 477 U.S. 242, 247-48 (1986))(emphasis in original).

The movant has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is absent. Celotex v. Catrett, 477 U.S. 317, 322-24 (1986).  Once the movant has met its burden, the onus is on the nonmovant to establish that there is a genuine issue of material fact. Id. at 324.  In order to meet this burden, the nonmovant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Celotex, 477 U.S. at 324.

An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. Anderson, 477 U.S. at 248.  Factual disputes are genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.  On the other hand, if after the court has drawn all reasonable inferences in favor of the nonmoving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

<u>Discussion</u>

**First Claim for Relief – False Light/Invasion of Privacy**

Defendants argue that Plaintiff's claim for false light/invasion of privacy is duplicative of her claim for defamation and must be dismissed.  Defendant relies on Rice v. Comtek, 766 F.Supp. 1539 (D.Or. 1990) to support this argument.  In Rice, which was filed on March 27, 1990, the court held that when a false light claim is based on defamatory statements, as opposed to nondefamatory statements, the claim is duplicative of a defamation claim based on the same defamatory statements and must be dismissed. Id. at 1542.  However, the court noted that the Oregon appellate courts had

not yet considered the issue.

Subsequently, the Oregon Court of Appeals issued an opinion in which it distinguished a false light claim from a defamation claim and found that both could be pled under appropriate circumstances. Magenis v. Fisher Broadcasting, Inc., 103 Or.App. 555 (1990). The appellate court acknowledged that both defamation and false light claims require proof that the published material was not true but then held that the claims are:

> theoretically distinct * * * in that a defamation action is primarily concerned with damage to reputation, while a claim of false light addresses the plaintiff's interest in being left alone and compensates for mental and emotional suffering resulting from the invasion.

> * * *

> Thus, although not all false light cases are actionable as defamation, all defamation cases involving publicity are potentially actionable as false light claims. When the published statement complained of is both false and defamatory, the plaintiff may proceed on either theory, or both.

Id. at 558-59. The Ninth Circuit recently recognized a similar distinction between the two claims under Nevada law and held that a plaintiff may pursue both a defamation and a false light claim where the plaintiff alleges she suffered mental distress as well as an injury to reputation as a result of the offensive statements. Flowers v. Carville, 310 F.3d 1118, 11321 (2002).

Here, Plaintiff has alleged both damage to reputation and emotional distress. Plaintiff is entitled to proceed on both her false light and defamation claims.

The Oregon courts have held that the elements of a false light/invasion of privacy claim are as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
> (a) the false light in which the other was placed would be highly offensive to a

reasonable person, and

(b) the actor has knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Dean v. Guard Publishing Co., Inc., 73 Or.App. 656, 659 (1985) quoting Restatement (Second) Torts §652E. The standard to be applied in false light claims is virtually identical to the actual malice standard imposed on public figures in defamation actions and the finding of a lack of actual malice for one claim will also bar the other claim. McNabb v. Oregonian Publishing Co., 69 Or.App. 136 (1984).

To satisfy the actual malice standard, a plaintiff must show with clear and convincing proof that the defendant published the defamatory statement: (a) with knowledge that it was false or with reckless disregard of whether it was false; (b) with a high degree of awareness of its probable falsity; or (c) when the publisher in fact entertained serious doubts as to the truth. Id. at 140. Mere negligence is not sufficient. Masson v. New Yorker Magazine, Inc., 501 U.S. 496 (1991). A plaintiff must establish that the publisher had actual knowledge that the statements were false or was wilfully blind to the truth. Rattray v. City of National City, 36 F.3d 1480, 1487 (1994). Any public figure seeking damages for a defamatory statement must prove the existence of actual malice by clear and convincing evidence. New York Times v. Sullivan, 376 U.S. 254 (1964).

Plaintiff asserts that there is evidence that Defendants "simply fabricated certain statements." In order to prove that Defendants published those "fabricated statements" with actual malice, Plaintiff must show that Defendants knew that the statements were false or that the Defendants were willfully blind to the truth. Plaintiff has not met this high threshold.

While Plaintiff consistently asserts that Defendants "knowingly falsely charged" Plaintiff with dishonest and unethical behavior, Plaintiff does not offer evidence to support her claim that the

Defendants knew the charges were untrue.  Plaintiff offers a vast amount of evidence to prove that the statements were not true, including the 140-page Packet that she provided to the city counsel in an attempt to refute Defendants' charges.  However, there is no evidence that Defendants were aware of the information contained in the Packet or had access to such information before it was provided to them in June 2002.  In fact, the information contained in the Packet appears, for the most part, to have been compiled after the most of the charges were leveled against Plaintiff and didn't event exist in that form prior to June 2002. Clearly, Defendants can not be held liable for knowing information that didn't exist.

Even after Defendants reviewed the contents of the Packet, as well as other information provided by  Plaintiff after the statements were published, Defendants challenged a number of Plaintiff's conclusions, asserting that Plaintiff had put her own spin on the facts and misled the public through deceptive presentation of the facts.  For example, Defendants stated that "[e]mployee stress-related illness, sick time, turn over and litigation for these offenses grows more indefensible each day."  Initially, this statement is clearly an opinion about Plaintiff's fitness for duty as Corvallis police chief and is protected under the First Amendment.  Dodds v. American Broadcasting Company, Inc., 145 F.3d 1053, 1059 (9th Cir. 1998)(The First Amendment allows the public freedom to express opinions regarding fitness or qualifications for public officials).

Even assuming that the statement is actionable as a statement that employee satisfaction was low and turnover was high, Plaintiff has not proven that these statements are false.  In the Packet, Plaintiff asserts that there have been no employment-related lawsuits in the past nine years.  This ignores the fact that Plaintiff concedes that union grievances, presumably by employees about working conditions, have increased substantially.  Additionally, Plaintiff admits the police

department's turnover rate has ranked 4th, 5th and 2nd over the past three fiscal years. The figures supporting these rankings show that the police department turnover rate exceeded the average rate for eight city departments and that the police department regularly ranked in the bottom half of the city departments. This evidence, offered by Plaintiff, unequivocally supports Defendants statements rather than establishing that Defendants were lying and knew that the statements were false. Defendants' statements that the employees were dissatisfied with their working environment and with Plaintiff in particular are supported by the "no confidence" votes of the vast majority of both union and non-union employees.

Also, Plaintiff specifically objected to Defendants' statement that she had "wasted hundreds of thousands of dollars" in consulting fees. Plaintiff concedes that whether the consulting fees were a waste is a statement of opinion. She objects only to the statement that she spent "hundreds of thousands of dollars. The evidence presented by Plaintiff establishes that she spent nearly $120,000 on consulting services from 1993 to 2000. There is no evidence that Defendants had access to Plaintiff's payment vouchers or knew the exact amount of money expended on consulting services. Plaintiff admits that she spent over a hundred thousand dollars. Defendants' statement may be an exaggeration but the spending of a large amount of money on consulting fees is supported, to some degree, by the record and defeats any argument that Defendants knowingly and maliciously increased the estimated amount of expenditures.

Plaintiff also argues that this statement is evidence of actual malice because Defendants did not have the expertise to assert a charge of fiscal mismanagement without consulting with experts. Defendants can surely reach an opinion that many of the consulting studies requested by Plaintiff were "wasteful" without hiring an accountant to support that opinion. Additionally, as noted above,

the statement was based on personal knowledge and experience, not complicated financial statements. Defendants were competent to determine on their own that Plaintiff spent too much money on consultants.

Plaintiff argues strongly that Defendants' charge that she lied to the Justice Department investigator is evidence of malice because the statement was groundless. First, Plaintiff misstates Defendants' statement. The press release following the Justice Department report contained a statement of opinion that "[i]t is clear to us who know her that she lied to the investigator." Second, it is true that the Justice Department did not reach the conclusion that Plaintiff had lied. However, the report did note that the Justice Department was troubled with the difference in the reports of Plaintiff and two of her officers and went on to point out that a person "conscious of improper conduct may try to engage in revisionism." This statement can easily be construed to express the Justice Department's concern that Plaintiff may have been less than honest to save herself. In this light, the report supports, rather than contradicts, Defendants' statement of opinion.

Defendants represent that the majority of the information contained in the press releases was garnered from twelve years of working in the Corvallis police department under Plaintiff. Defendants claim that they attempted to verify all of the factual information included in the press releases either through personal experience, the experiences of other officers or the review of documents, if any existed and were available to the officers. All of the Association's board members were deposed and none of them testified that they entertained any doubts about the truthfulness of the statements contained in the press releases or that they purposely failed to investigate any statements to avoid uncovering the truth.

The statements about which Plaintiff complains are too voluminous to address individually.

Suffice it to say that the court has reviewed the entire record in detail and was unable to find a single statement that was either not supported in someway by the underlying facts or that Defendants knew were false and reported anyway in a malicious manner.

The next issue raised by Plaintiff is Defendants' misquoting and fabrication of quotes from Plaintiff. Plaintiff asserts that this is evidence of Defendants' actual malice. The Supreme Court addressed this issue in <u>Masson v. New Yorker Magazine, Inc.</u>, 501 U.S. 496, 517 (1991) and concluded that:

> a deliberate alteration of the works uttered by a plaintiff does not equate with knowledge of falsity for purposes of <u>New York Times Co. v. Sullivan</u> and <u>Gertz v. Robert Welch, Inc.</u>[2], unless the alteration results in a material change in the meaning conveyed by the statement. The use of quotations to attribute words not in fact spoken bears in a most important way on that inquiry, but it is not dispositive.

In her affidavit, Plaintiff refers to the May 20th Press Release for examples of mis-quotations. She asserts that Defendants "paraphrase small portions of unrelated newspaper stories" and links them together to support their claim that Plaintiff is dishonest. Plaintiff complains that Defendants did not contact her or the newspaper to determine if the stories were correct or if she was quoted correctly.

The essence of Plaintiff's complaints, as set forth in her affidavit, is not that the May 20th press release altered the meaning of the material contained in the articles, but that they did not precisely quote Plaintiff or the articles in which the quotes were printed. For example, Plaintiff complains about the following statements in the May 20th press release:

> After an under college student fell to his death after consumption of alcohol, Pam Roskowski stated:

---

[2]Citations to these Supreme Court cases have been omitted from this quote.

The main source that brings students into contact with police seems to be underage drinking. An increase in alcohol-related deaths adds to Roskowski's concerns about an apparent mentality that invites drunkenness.

"I'm concerned about cracking the alcohol abuse cultures on campus," she said. We're having people die, and they're not taking the issue seriously." (Gazette Times 03/14/02).

However, in response to why she attempted to have citations dismissed for underage drinking, (minor in possession of alcohol), issued to two college age males:

"Roskowski said she decided it would be best to dismiss the tickets because they were "minor infractions." "We could have had Chico Police Department serve the tickets, but it was such a minor issue." (05/15/02 Gazette Times).

In her affidavit, Plaintiff argues that the first paragraph of the statement was an observation of a reporter based on a discussion between the college leadership and the police -- not a quote from her. While the introductory paragraph notes that "Roskowski stated," the paragraph is not contained in quotes and refers to Plaintiff as "Roskowski," not I, which infers that the information is being provided by someone other than Plaintiff. Additionally, quotation marks are absent from the first paragraph but are included in the second paragraph, leading to the conclusion that only the second paragraph is a direct quote of Plaintiff's. Plaintiff admits that she said "I'm concerned about cracking the alcohol abuse culture on campus" and that the sentence "We're having people die, and they're not taking the issue seriously" is also an accurate quotation of the opinion she expressed.

With regard to information relating to the minor in possession citations, Plaintiff complains that the first sentence is in quotes which leads the public to believe that she said it. Again, the quoted sentence starts with "Roskowski said" which more likely implies that someone is paraphrasing something that Plaintiff said. Plaintiff concedes that she said "We could have had Chico Police Department serve the tickets, but it was such a minor issue." Plaintiff also complains

because the first sentence is found in the first part of the article while her quote was located later in the article.

The important thing here is that there is no evidence that, while the May 20th press release may not have quoted the underlying newspaper articles word for word, the summary does not drastically skew the import of the information contained therein. The small modifications that Plaintiff complains about do not amount to false statements or a material change in the meaning of the articles. Consequently, these deviations do not support a finding of actual malice.

Finally, Plaintiff asserts that the Association's president and the Local's representative had a personal grudge against Plaintiff and had engaged in strikingly similar public campaigns against the former police chief and city manager. Plaintiff contends that this animosity between Defendants and Plaintiff is evidence of actual malice. While ulterior motives may factor into a finding of actual malice, "the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the word." Harte-Hanks Communications, Inc., v. Connaughton, 491 U.S. 657, 666 (1989). It is fairly clear that there was no love lost between Plaintiff and some of the Association and Local officials. However, a large majority of the police department employees voted "no confidence" in Plaintiff and felt that the department would be better if she resigned. This overall dissatisfaction is based on Plaintiff's management technique and decisions. The mere fact that two or three of Plaintiff's employee's had a grudge against is not the reason the Association called for Plaintiff to step down. Any ulterior motives of the few would have been tempered by the remaining neutral employees who had the same ultimate opinion about Plaintiff and her ability to continue to serve as police chief.

The evidence that Defendants had engaged in this behavior before weakens Plaintiff's

argument that Defendants' action were based on their desire to harm Plaintiff. This campaign clearly was not against Plaintiff, personally, but was another attempt by Defendants to make sure that their police department was running smoothly and was providing the best possible service to the community.

Next, Plaintiff concentrates on Defendants' publication of unverified anonymous e-mail on the Association's website. The Communications Decency Act of 1996 (the "Act") provides a federal immunity to any cause of action that would make computer service providers liable for information originating with a third-party user of the service." Zeran v. America Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997). Stated another way, the Act "precludes courts from entertaining claims that would place a computer service provider in a publisher's role." Id.

The Act specifically provides that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. §230(c). "Interactive computer service" is defined in relevant part as "any information service, system or access software provider that provides or enables computer access by multiple users to a computer server * * *." 47 U.S.C. §230(f)(2). The term "information content provider" means "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. §230(f)(3). To qualify for protection under the Act, a defendant must prove three things; 1) that it is a provider or user of an "interactive computer service;" 2) the information complained about must be solely provided by another "information content provider; and 3) the asserted claims must be based on the defendant's responsibility as a publisher or speaker of information. Schneider v. Amazon.com, Inc., 108 Wash.App. 454, 460 (2001).

Website providers have been found to fall within the definition of a provider of an interactive computer service under the Act. The California courts held that eBay, a website provider for auctions, qualifies for protection under the Act even though it does not enable access to the Internet. Stoner v. eBay, 2000 WL 1705637 (Cal. Sup. 2000) cited with approval in Carafano v. Metrosplash.com, Inc., 207 F.Supp.2d 1055, 1066 (C.D. Cal. 2002). Similarly, our neighboring state courts to the north have held that Amazon.com, a website retailer that allows customers to post reviews and comments on their purchased products, falls squarely within the definition of  an interactive service provider. Schneider, supra, 108 Wash.App. at 461. The evidence before the court is that the Association created and maintained its website to provide a public forum for the exchange of ideas with regard to Plaintiff. The court finds that the Association was acting as an "interactive computer service" in providing and maintaining the website.

The next question is whether the information was provided by another "information content provider." To qualify for protection under the Act, the interactive computer service must be merely a vehicle for others to post or present their ideas and can not control the information provided in any way. Carafano, supra, 207 F. Supp.2d at 1066-67 (matchmaking service that required users to answer a series of multiple choice and essay questions was responsible, in part, for the information provided through the internet and did not qualify for protection under the Act.) The information complained about is the anonymous e-mails critical of Plaintiff's performance as chief of police that were made available through the website. Defendants claim that each of these e-mails was posted directly to the website by the anonymous author and that Defendants had no control over who posted or what was posted on the website. Plaintiff has offered no evidence to the contrary. All of the e-mails presented to the court were addressed to the mayor, members of the Corvallis city council

and/or radio talk show host Lars Larson and were written by individuals under fictitious names. There is no evidence that the e-mails were forwarded to Defendants prior to being posted to the website or that Defendants had any control over the information contained in the e-mails that were posted on the website. The information complained about by Plaintiff was provided solely by an information content provider other than Defendants.

Plaintiff alleges that Defendants are liable for "publishing" unverified anonymous e-mails on its website. Plaintiff is clearly treating Defendants as publishers or speakers of the information. Defendants qualify for protection under the Act and can not be held liable for any defamatory information posted by others on its website.

For all of the reasons stated above, the court finds that Plaintiff has failed to prove that Defendants acted with actual malice in issuing the press releases asking for Plaintiff's resignation and that Defendants are not liable for the content of any e-mail posted to the Association's website. Defendants are entitled to summary motion on Plaintiff's claim for false light/invasion of privacy.

**Second Claim for Relief – Defamation**

The *prima facie* elements for defamation under Oregon law are:

1) the making of a defamatory statement; 2) the publication of the defamatory material; and 3) a resulting special harm (unless the defamatory statement gives rise to presumptive special harm).

L&D of Oregon, Inc., v. American States Insurance Company, 171 Or. App. 17, 22 (2000). A public official may not recover "damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Company v. Sullivan, 376 U.S. 254, 279-80 (1964).

Plaintiff concedes that she was a public official at the time of the defamatory publications and that she must prove Defendants acted with actual malice to support her defamation claim. For the reasons given above with regard to Plaintiff's false light claim, this court finds that Plaintiff is unable to establish that Defendants acted with actual malice. Accordingly, Plaintiff is unable to prove her claim for defamation.

**Third Claim for Relief – Intentional Infliction of Emotional Distress**

In her Third Claim for Relief, Plaintiff alleges that Defendants "intentionally inflicted severe emotional district on Plaintiff by conducting a calculated, unrelenting campaign of sensationalized misinformation to the public and Plaintiff's prospective employers * * *." Under Oregon law, a claim for intentional infliction of emotional distress only lies where the defendant intended to inflict severe emotional distress on the plaintiff, the defendant's acts were the cause of severe emotional distress, and the defendant's acts were an "extraordinary transgression of the bounds of socially tolerable conduct." Madani v. Kendall Ford, Inc., 312 Or. 198, 203 (1991). It is the defendants' acts, rather than their motives, that must be outrageous. Id. at 204.

The Oregon courts have limited the term intent to include only those situations where the defendant "'desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct.'" McGanty v. Staudenraus, 321 Or. 532, 550 (1995)(quoting Restatement (Second) of Torts, § 46, comment i (1965)). The conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Christofferson v. Church of Scientology, 57 Or. App. 203, 211 (1982) (quoting Restatement (Second) on Torts, § 46, comment d (1965)).

To be actionable, a plaintiff must, in fact, suffer mental or emotional distress of a severe and serious kind as a result of defendant's conduct.

> The tort does not provide recovery for the kind of temporary annoyance or injured feelings that can result from friction and rudeness among people in day-to-day life even when the intentional conduct causing plaintiff's distress otherwise qualifies for liability.

Hall v. May Dep't. Stores Co., 292 Or. 131, 135 (1982). The court does not require objective medical evidence of the distress, such as medical, economic or social problems, noting that it is the distress that must be severe, not the physical manifestations. Bodewig v. K-Mart, Inc., 54 Or.App. 480, 488 (1981).

This court finds, as a matter of law, that Defendants' conduct was not extreme or outrageous. The United States Supreme Court has held that criticism of public officials is important to successful government and has protected such speech in the absence of actual malice. This court has found that Defendants' speech falls within that protection. Clearly, engaging in speech that is protected under the First Amendment is not conduct that is so "extreme in degree, as to go beyond all possible bounds of decency, [or] to be regarded as atrocious, and utterly intolerable in a civilized community." Plaintiff is unable to support her claim for intentional infliction of emotional distress.

Defendants also argue that Plaintiff has failed to show that she suffered adequate emotional distress as a result of Defendants' conduct. In her affidavit, Plaintiff reports that she suffered nearly nightly sleep disturbances starting in April 2002 as a result of Defendants' campaign against her. Additionally, she had difficulty with concentration and she was tearful, fearful and worried. In December 2002, she sought help from her physician and was diagnosed with depression. She was prescribed Sonata, for her sleep disturbance and Meridia for anxiety and weight gain. The sleep disturbance continued until the middle of March 2003 and the anxiety continues. In early 2003,

Plaintiff was diagnosed with hypertenstion.

In her deposition, Plaintiff testified that in January 2003, she reported to her prospective employer that she suffered from insomnia as a result of the conflict with Defendant. The psychological testing performed by her prospective employer in January 2003 established that Plaintiff was essentially stable and suited for the position in question. This diagnosis took into account Plaintiff's insomnia but noted that the symptoms were limited to the time of the problems and that Plaintiff never stopped work as a result of her distress. In a questionnaire completed on January 9, 2003, Plaintiff represented that she had never been seen professionally by a psychiatrist, psychologist or family counselor and that she had never been prescribed medication to help her deal with emotional or psychological distress, with the exception of a seven-day sample of Lexapro. This clearly contradicts Plaintiff's affidavit in which she states she was prescribed Sonata and Meridia to deal with the distress she was suffering as a result of Defendants' campaign against her.

Viewing Plaintiff's evidence in a light most favorable to her, she has established that she suffered from distress from April 2002 to December 2002, when she sought medical help and received prescription medications for insomnia, weight gain and anxiety. However, Plaintiff was sufficiently recovered by January 2003 to pass a battery of psychological tests. She was not prevented from performing any job function as a result of her distress symptoms and her insomnia had dramatically improved as of March 2003. In Rockhill v. Pollard, 259 Or. 54 (1971), the Oregon Supreme Court held that evidence that a plaintiff became nervous, had to take tranquilizers, had troubles with sleeplessness and loss of appetite, all for over a two- year period was sufficient to support a prima facie case of intentional infliction of emotional distress. The court noted that, while it is a close case, "mental distress would have to be more than mild and transitory in order to cause

these symptoms over a two-year period." Id. at 64

Here, Plaintiff suffered similar symptoms over an eight-month period. However, the symptoms were not severe enough to cause her to seek medical assistance until the end of the period and then were sufficiently relieved in January 2003 to allow her to pass a psychological exam and work at her new job without any disruption from her symptoms. Once Plaintiff left the Corvallis police department, her symptoms improved dramatically. If the Oregon courts considered the Rockhill case to be a close call, this court can only conclude that similar symptoms that resolved after eight months rather than continued for two years would not be a close call and would not be sufficient evidence of distress to make out a prima facie case.

**The Local**

Defendants move, in the alternative, to have the Local dismissed as a Defendant because there is no evidence that the Local had any involvement in publishing any of the allegedly defamatory statements. The court agrees. The only evidence in the record regarding the Local's involvement establishes that the Association reported the "no confidence" vote to the Local and asked the Local to fax two or three of the press releases because the Association didn't have the ability to accomplish that. This is not sufficient to render the Local liable for publishing the allegedly defamatory statements. Even assuming the Association is liable for the publication of defamatory statements, the Local is entitled to summary judgment based on the lack of evidence of

/ / / / /

their participation in the preparation or publication of those statements.

<u>Conclusion</u>

Defendants' motion (#42) for summary judgment should be GRANTED.

<u>Scheduling Order</u>

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due **March 24, 2005**. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 9th day of March, 2005.


_____/s/   Donald C. Ashmanskas_____
DONALD C. ASHMANSKAS
United States Magistrate Judge